Good morning. My name is Ben Coleman. I represent Mr. Williams. The way we're going to do the division of time is that I'm going to take ten minutes. Mr. Burke, who represents William Steele, is going to take six minutes. And then Brian White, who represents Mr. Brown, is going to take four minutes. And of my ten minutes, I'm going to attempt to reserve one minute for rebuttal. White for Brown, and who's the six? The six is Mr. Burke for William Steele. Bird for Steele. And your name again? And I'm Coleman for Williams. Coleman for Williams. Thank you. Unless the court had a different preference, I was going to focus in on the jury note issue. This court in the United States v. Seichua held, and then again this court reiterated in the United States v. Aja Boye, and my pronunciation of those two cases may be a little bit off, but this court held that if a district court knows the identity of a holdout juror, and that holdout juror is aware that the judge knows of his or her identity, then the district court cannot give an Allen-type instruction, in any Allen-type instruction, whether it's a dynamite instruction or a nitroglycerin instruction or a more mild Allen instruction. It's just not allowed. And in this particular case... Does Seichua or Abajue make that point? Yes, they do. Because of nature, how severe the Allen charge was. It does. In fact, in the United States v. Seichua, at page 725, that second, 530, and actually at page 531, the court explains what the appellant in that case did, is the appellant made a variety of objections to the language that was used in the Allen charge. And what this court held was, what it said is, in a half a dozen respects, appellant challenges the substance of the charge given and notes respects in which it departs from the charge approved by the Supreme Court. We need not reach these issues so presented. In our view, the giving of any Allen-type charge under the circumstances was bound to be coerced. So how you want to parse the language of the charge doesn't matter. The bottom line is that if the district court knows the identity of the holdout and the holdout knows that the district court knows her identity, game over. Counsel, is there anything that the district judge could have done to have saved this? The district judge had no choice but to declare a mistrial? In my opinion, the only sound exercise of discretion would have been to declare a mistrial. And the district court should have done that as soon as she received the note from the juror in which the juror discloses a possible vote and her name and tells the judge that she's likely to be the holdout. Yes, and we couple that with the allegation of prejudice and the other circumstances of this case where it's the only black juror with three black defendants. Does it make a difference that the jury doesn't appear to have taken a formal vote? I don't believe that it does. She has represented what her position is. She has told the judge that she is a holdout, that the other judges are hard on declaring guilty verdicts, and that it doesn't matter. If there was anything that this district court could have done, it would have been to inquire about the prejudice. Maybe the district court could have taken that step and brought Ms. Sabree, the juror, into the court, into the jury box and said, I understand you're alleging prejudice. What is the prejudice? Counsel, I'm having trouble with the district judge inquiring. Generally, there's an evidentiary rule that prohibits inquiry into jurors' deliberations, so we're not allowed to find out what it is that they're talking to each other about in the jury room. Would there be an exception for this? Well, there are exceptions for allegations of prejudice or some other type of bias, yes. There is an exception. So you could have, despite Rule 606, you could have an evidentiary hearing in a habeas where the judge asked each juror is the reason that you voted to convict that you have something against black people and the defendant was black? Well, I'm trying to think now as far as a habeas is concerned and how that would come into play if you're coming over from the state court and what the state court rules are. But I believe the Ninth Circuit precedent under Angulo is that if there is an allegation of prejudice, a credible allegation of prejudice, that the district court must make an inquiry. We're talking about two different kinds of prejudice. One thing to say I voted against, I voted guilty because I didn't like the defendant's race. It's quite another to say I refused to deliberate with this juror because this juror was black. That's a different kind of an issue. And I assume that's what you're thinking now. Well, I'll say that any type of prejudice, I mean, whether it was the first that you mentioned, whether they voted guilty because the defendants were black, or it's also, I think, improper if the jury is saying, well, we're not going to deliberate with you because you're black. I mean, whatever type of prejudice there is, I think it all would be a free game for an inquiry. But the bottom line is. One strikes me as more structural than the other, but go ahead. But the bottom line is that I don't even think that the court, at the very least, I think there should be a hearing, but I think five years after the fact, a hearing would not produce much. The bottom line is that the charge that was given to this jury after this juror declared that she was a holdout, the judge knew she was a holdout, the holdout knew that the district court knew she was a holdout, under Szechua, under Aja Boye, the law is clear in this circuit that there needs to be a new trial. Most district judges, jury comes in. And the clerk says the jury has something they want to tell you or the bailiff does. And the judge says, I understand that you're hung. I don't want to know who's on which side and I don't want to know how many people are on which side. And then he gives them the Allen charge. Correct. But here he couldn't do that because the note already said it's 11 to 1 and I'm the one for acquittal? Correct. Is anything modified at Szechua since 1984? No. And Aja Boye, which comes afterwards about 10 years later, actually further articulates it. If Aja Boye is a 1992 case, now Chief Judge Kaczynski and Judge Canby was on the panel, and this court says, even when the judge does not inquire but is inadvertently told of the jury's division, reversal is necessary if the holdout jurors could interpret the charge as directed specifically at them. That is, if the judge knew which jurors were the holdouts and each holdout juror knew that the judge knew he was a holdout. And then this court goes on to say, Szechua is a good example. There on the second day of deliberations, the jury foreperson sent a note to the judge indicating that 11 jurors were in favor of conviction but that one juror, while expressing the view that he believed the defendant was guilty, persisted in voting not guilty. The judge brought the jurors into the courtroom and told them as to whether they believed further deliberations could result in a verdict. All but one of the jurors believed the verdict could be reached. The judge gave an Allen charge, and after several more hours of deliberations, the jury returned a guilty verdict. We noted that the rational inference was that the one juror who did not believe a verdict could be reached was the one who persisted in voting not guilty. Thus, the district judge was aware of the identity of the sole dissenter, and the dissenter was aware the judge had this knowledge. So basically, under these two cases, if a jury note comes in, it's 11 to 1, I'm the one, I'm for acquittal. There's absolutely nothing to do but declare a mistrial because of a hung jury. Correct. Could the judge – would it require a mistrial if the judge just said, continue deliberation? Potentially, no, because at that point, there wouldn't be an Allen-type charge. Although I would still – my position would still be that the sound exercise of – Well, the H.Y. has this one thing saying that, you know, under some circumstances, mere disclosure to the judge of the nature and extent of the jury is numerical evasion. Correct. Correct. All right. Do you have – you said that it doesn't matter whether they've gotten to the point of voting. Is there any case that's addressed that yet? Well, before – I don't believe that there necessarily is, but in this case, I think there was a vote. I mean, she's saying, I'm voting not guilty. All the other jurors are hard on declaring guilty verdicts. Well, that doesn't state that they've actually taken a vote. So she's just representing to the judge that she thinks that everybody else is going to vote in favor of conviction. That's a little different from taking the formal vote. Does it make a difference? I don't believe it makes a difference. If you know the identity of a holdout, someone who is expressing that they're a holdout, and the holdout knows that the judge knows his or her identity – It may only be important here that the juror perceives that she is the lone holdout. Correct. She's going to interpret any Allen charge as directed at her. Correct. That's the danger, irrespective of whether 10 of the jurors are actually with her. Absolutely. That's absolutely correct. So what I'll do is I'll reserve – I've got about a minute left, and I'll reserve that for rebuttal unless there are any more questions. Thank you, counsel. Thank you, counsel. Counsel? Good morning, Your Honor. I wanted to talk about the 801D2E issue in this case. The district court agreed that in this case – that the crux of this case is whether an agreement was formed on November 14th at the Comfort Inn. That was a finding by the district court at Volume 8, page 1272. The government witness Hollingsworth testified there was no – he talked about previous conversations that took place in the room over a three- to four-hour period that day while they were waiting for the undercover agent to arrive. And there was no discussion in his testimony about any plan, about what they were going to do, just a general conversation. The government mentions they talked about a movie that they thought was relevant, but there's nothing specific about any plan to rob a stash house. And the government informant, Tony, he testified that they should come down and hear the plan. So the court's finding was reasonable that it really was – the crux was whether they agreed when they entered that room on the 14th. So all the prior conversations between the lead defendant, Mr. Williams, and the informant and the agent were prior to November 14th, were prior to the formation of any conspiracy. Objection was made, even limiting instruction was asked for, and that was denied. But I think this is error on the part of the district court because under the Sears rule you have to have – it can't just be a defendant and an agent or a defendant talking to an informant. And the informant insisted that they bring a crew, that the crew have tools and they better be more than baseball bats in this case. And in this case, when the crew arrived and heard the pitch from the undercover agent, if you assume arguendo that they agreed, and that was something that we contested all along, that would not allow the 801 D2E to come in retroactive to the formation. And that's essentially what the district court ruled in this case at Volume 8, 1272 to 1274. She essentially said once it comes in, it's very broad and essentially that it goes backward. And yet there was no way of finding it. Or was there a suggestion that the circumstances could be interpreted to suggest that the conspiracy was formed at an earlier time? Well, I think one of the counter – obviously one of the government's arguments is – well, I think that the focus of the government's case was that a conspiracy was formed on November 14th. In that room, the government has suggested, well, they had already agreed when they came there. And I think that's really contrary to the evidence. But even if you were to assume arguendo that the crew had agreed earlier than that, they brought in tapes going back to the very beginning before there was any possible crew. And so – I guess I was wondering, sort of – you described the judge as saying, well, look, once the conspiracy is formed, anything way back goes in. And I was trying to see whether the judge was saying, well, the conspiracy existed earlier. It's what the judge said, not what – No, I don't believe that's what the judge was saying. I asked the judge, do you mean retroactively? And she said yes. So I think that she had an overbroad construction of how 801D2E could apply. I seem like I have very little time left. I also want to briefly address another issue, which was the Brady slash perjury issue. They're two separate issues that strongly overlap. But the major crux of the Dubbins case and Star Witness testimony was that everyone agreed to participate at the Comfort Inn on November 14th. Why was – that tape should have been disclosed. Why wasn't it non-prejudicial because you got a chance to deal with it after it was disclosed? Well, that really goes to the Brady issue. That was disclosed at the – near the very end of the rebuttal argument. But then the judge said you could reopen the evidence and cross-examine the agent, couldn't you? Yeah, we had a brief opportunity to cross-examine the agent and give some additional closing argument. However, I had made an argument, a closing argument, that a nod is an ambiguous gesture. And it can mean many things. It can mean to say hello or to acknowledge what someone said. And then all of a sudden you've got this evidence. Maybe your guy didn't nod. Yes. In fact, I think the evidence shows clearly that my client didn't nod. Counsel, if we were to reverse on the jury question, then this would be cured on the retrial witness. Well, of course, on my first issue, the 801D. The 801D would still need to be resolved. Yeah, because I think that would be straight reversal. But the Brady issue is cured. Yes, Your Honor. You're going to have to retry this. You're going to retry this differently. This would be – yeah, this would essentially be a different ground for a retrial as opposed to my first issue. So the next time your defense is your guy didn't nod. Straight out, and I'd use it as part of my theory of the case and in cross-examination of various witnesses, Your Honor. And I think, like I said, the two issues overlap. That's the perjury and the Brady. With that, I'll reserve some time for rebuttal. Thank you. Thank you. I have one more defense. Oh, I'm sorry. Good morning, Your Honors. The issue that I wanted to talk about is this issue of outrageous government conduct and also found and steel standing. Before I do that, I want to address Judge Canby's question that she posed to Mr. Burke regarding what the court found, because this kind of dovetails into my argument as well. In terms of when the alleged conspiracy was formed, in Volume 8 of the transcripts from November 5th of 2003, page 1272, the district court stated that she agrees that the whole issue in this case is whether they agreed in that room. So that really was the crux of the issue. And that ties into Brown and Steele standing to raise enjoyment in an outrageous government conduct issue. Contrary to cases also cited by the people, in particular Bogart and Valdovinos, where in those cases the party asserting an outrageous government conduct had no direct dealings with a government agent. In our case, in that room, which was the crux of whether or not a conspiracy was formed, both Brown and Steele had direct contact with a government agent, Enrique, or Agent Panatti, who, according to him, went to everybody in the room and asked them whether they were in. He delivered the pitch of this stash house robbery and asked everybody, Are you in? And according to Panatti, everybody gave their assent. So that was direct government involvement, which gives Brown and Steele standing to raise an outrageous government conduct issue. And in turning to that issue now, I think it's clear, if you look at what the government's argument... So their assent at the meeting, if the jury believes they assented at the meeting, gives them standing to challenge the outrageous conduct that does involve them. Yes. The outrageous government conduct being Tony's contact with Williams before the guys ever show up on November 14th. Right. And that whole... And if you look at what the... And remember, the government's claiming that we had a necessity to do this to prevent a bank robbery. If you look at the chronology, the government had many opportunities to thwart this alleged bank robbery if it was even legitimate to begin with. It was clear that the relationship started out with Tony and Williams non-criminally. Then there was these series of drug deals that fell through. Then there was a...  And the very next day, he sells a gun to raise money for a getaway car. Let me ask you something about outrageous conduct. Yes. It seems like there are innumerable cases that in dicta create this category that would be grounds for reversal. But no defendant ever wins on it, no matter how outrageous the conduct is. And some of the conduct is really outrageous. Right. Is there something like this case where a defendant actually won? Well, I think if you look at Bogart, the court remanded for factual findings and indicated that that may have been a case where an outrageous government conduct would apply. If you look at Greene, which is cited in the pleadings, this was the illegal bootlegging operation. That was a case where the government entirely manufactured the crime, which is what we have in this case. In Greene, the defendant won. Yes, yes. And there was also, I believe, in Twigg, which is cited in the pleadings, this was another case where a government manufactured a methamphetamine production. And the essence of the crime in this case is that the government entirely manufactured this crime from whole cloth. It didn't need to do it. And the reason that the government didn't make arrests, for example, on the gun charges, is because they don't get enough time on that. In this case, they knew if they could form a conspiracy, they have more members to indict, and with 100 kilos and a robbery and so forth, they're going to get a significantly greater sentence than they would otherwise have received. And that's why they pushed so hard for this robbery, even when the indications are Williams had an interest in doing a marijuana deal and not the Stash House robbery. And I see I have exceeded my time. Thank you. Thank you. May it please the Court. Steve Miller for the United States. With regard to the jury question, there are three points that ought to be made. First, that the Supreme Court has recognized that there is a societal cost to retrials. And consequently, there's afforded great deference to a district court's decision to grant or deny a mistrial. With that, a district court is entitled, if not obligated, to see if that motion or the possibility of mistrial. Well, I don't understand how you get around Cetua and Adjuboya. It looked to me like Cetua is just a pretty clear rule that once the judge knows it's 11-1, when he gives an Allen charge, it won't work. It's coercive. And then in Adjuboya, it looks to me like the panel didn't like that rule much, so they distinguished it from the case, limited it because it was 9-3 and 1-9-3 was one way and 1-9-3 was another. But in limiting it, they reaffirm it, where the judge knows the identity and it's an 11-1, and he just has to try the case again. How do we get around those two cases? Well, the focus of Cetua was the coercion by the court on the holdout, and it is in the context of an Allen charge saying re-evaluate your position. And there was no coercion in this case. In fact, what happened was the court received a note from the lone black juror saying, may I be excused because I feel pressure. And what the court did was re-instruct the jury with the same 7.19, which told the lone juror discuss the case with your fellow jurors or reach an agreement if you can do so. And then the entire language of 7.19. I agree with you, counsel. I think the district court did everything she could here to try and salvage this proceeding. The question is whether once she knew that she had a juror who is now known to the judge, and the juror knows that the judge knows who she is, and the juror believes that she is the lone holdout, and the judge comes back in and says, I want you to continue deliberating, whether that puts pressure on the juror to cape. And after Sechua and Ojibwe, it's pretty tough to make a case here that this juror wasn't going to feel some pressure. Well, she was the one that disclosed what her position was, and then the court's remedy for that was to take steps to avoid any court. Why does it make a difference that the juror self-disclosed? Are you concerned that we might have jurors who will try and get themselves out of the middle of a trial? It's gone on too long. That's a distinct possibility. And the note was, may I be excused from this, my headache is getting worse. Right, and if that, but since she's now disclosed, I think that there probably is a danger in having jurors figure out how to self-excuse themselves by causing a mistrial. But that's a risk that we run, and it seems to me that when you balance that against a defendant's interest in a fair trial, that the juror probably can self-excuse if somebody's really determined to do so. Well, the defendant's complaint is that this juror didn't hold out, that that's the court and all the parties were not going to excuse the lone black juror, and that we're going to find some way to keep her on this panel so that we can avoid having to have the societal cost of a mistrial. And then the instruction, which is different from Sze Chua, is that there was no coercion on this juror. It was, this is. Wait a minute, Sze Chua, I was thinking maybe the court didn't like the Allen charge, but the judge or the panel in Sze Chua never quoted the Allen charge and said this language was coercive. They just said the circumstance that the judge knows one juror is the holdout makes an Allen charge coercive. Exactly. And that what is lacking in this case. Maybe the judge has the knowledge. What's lacking in this case is the coercion on the lone holdout. The instruction brought the panel back and said, You stick by your guns. Continue to deliberate and reach a decision if you can. Don't be afraid to change your opinion if the discussion persuades you you should, but do not come to a decision simply because other jurors think it's right. It's just a traditional Allen charge. No. I must have given a dozen of them like it. No, that's not the Allen charge. It doesn't have the thing, the sentence you were interrupted in giving isn't part of the Allen charge. No. The sentence I'm giving is the concluding juror instruction before the jury is released to deliberate. And that is the same instruction that the court gave when they reconvened. Are you talking about if you have a firm conviction, don't give it up, that sentence? Yes. That's in the form book for Allen charges. No, it says do not come to a decision simply because other jurors think it's right. That's in the form book. Yeah. And it's the same one. And it's. How does that distinguish it in the form book for an Allen charge? I think what Judge Heinkel is saying is that that is actually part of an Allen charge. But it's the. Is it? No. The other one is if you have the Allen charges, rethink your position in light of the other jurors. Just the sentence before that says do not be afraid to change your opinion. The succeeding paragraph says it is important that you attempt to reach a unanimous verdict. Yes. But then it goes on. But only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict. I agree. I think the district court did everything she could to try and do this. The question is after St. Shua whether there was anything that this district court could have done to have saved this. Or whether she was compelled to declare a mistrial. And I think that what she did saved it. Because not only did they say by rereading the concluding instruction, hey, stick by your guns and try and reach a verdict. But if you can't, so be it. Now, in addition to that. Look, I'm having trouble with this and maybe you can help me in another way. I'm worried about the same thing that Judge Bybee brought up. That a juror could sabotage the trial or get an early excuse just by sending a note to the judge. It's 11 to 1 and I'm the one and I'm not going to yield. St. Shua, bam, mistrial. I'm worried about that. However, I read St. Shua to say that's right, mistrial. I want to know if there's some subsequent authority that allows for the kind of argument that you're making. Allows for some kind of exception to St. Shua. That Ajaboya case doesn't. No subsequent authority. But what is missing in this case is the coercion of the holdout. Well, St. Shua said the coercion was inherent just in telling them to deliberate further when the judge knows that it's 11 to 1 and that judge is holding out. But then Judge Gonzales cured that by saying, stick by your guns. And then the modification, which was by the consent of the other defendants, was, and in addition to that, treat each other with respect. Treat each other's opinions with respect. Which could just as easily be read by the holdout juror as, you've got to respect the votes of 11 other co-jurors who clearly outvote you and outnumber you. Well, I think in this context. There's just no getting around that. You're in a tough position, counsel. Oh, I understand that. But I think that the collateral consequences of a court not being able to avoid a mistrial by taking these remedial steps, which was as uncoercive and as actually persuasive to the one juror that she knew as a holdout to say, stick by your guns so that I can have the opportunity to declare a mistrial. She didn't declare a mistrial because none had been, she had not been told by the foreperson that we can't reach a decision. During the notes, the foreperson said, this person refuses to deliberate. Therefore, deliberations may continue. There's a great possibility as long as the answer of this one juror's request to read your note. So that the distinction between this case and the other authority is that the coercion that was the concern in the other authority, and the other one, is not here. That the remedial instructions were to tell the lone juror, stick by your guns, and the rest of your jurors, listen to what she has to say. Counsel, there's another aspect of the case that makes me a little more reluctant to get creative with Sae Chua, and that is the Brady issue. It seems really disturbing to me that the case depends on assent at a meeting, and the defendants don't have the tape, and there's some secret tape that they don't find out about until rebuttal argument. That's always when you drop the hammer with something they hadn't thought of, and they have no chance to respond with argument or anything. I mean, that's really serious. It is, Your Honor. Why wasn't the tape disclosed? I thought that it had been by all indications during the trial. I was under the impression that it had been. On page 355, there was a transcript of the tape showing that there were these other conversations. I'm sorry, that's S.E.R. 355. On S.E.R. 564, there is a discussion with the agent saying it's on the tape. Play it. And during trial, the tape was disclosed, but the tape itself was not played for the defense lawyers or copies made of it for them? Apparently not. I do not recall. So they had to rely on the transcript that the government prepared? Yes, but they were aware that it was there, that on 564. There's usually a form request that defendants make for all tapes, photographs, and all kinds of other stuff. Did they make the request so that they'd get the tape if there was a tape? Yes. They didn't get the tape? Apparently not. And from all indications, they did not get it. But from the indications of the trial, it appeared as if they had. So a tape transcript was produced, but basically it was false? No, it was not transcribed. But also that they played a portion of the tape during trial. They're focusing upon the appearance of what Hollingsworth did once he got to the hotel. That portion was played. The flashbangs and the arrest were played. It seems irretrievable to me that you build your whole defense on dancing around the fact that your client nodded in assent, and then after that's out of your mouth, it turns out your client may not have nodded. Now that is the incorrect operating assumption that the conspiracy was formed at the hotel. The appearance at the hotel was to confirm, not to create, the conspiracy. It was the opportunity for them to back out, and that all indications from the evidence shows that the conspiracy formed before they nodded. Now, the fact that they were there showed that they had agreed to the conspiracy. When they were in the hotel, they had rented an Intrepid to drive down from Los Angeles to San Diego. They had two semi-automatic pistols hidden in the car with hollow-point bullets, knowing that they had already prepared to come down to do violence. And then when you take into consideration that Williams' statements, which are on SCR 282, saying, I've got a crew, this one guy did it before, and he's talking about how he's recruited his crew and that they know everything, and that the one person that's coming down, Mr. Hollingsworth, that's bringing down my gun, he doesn't know anything. And then when you take that with the fact that one of them says, I've got nine, but I only need one, and they're participating in wiping down the fingerprints, and after the meeting at the hotel, they get in the Intrepid that has the guns with the casualty-causing ammunition and drive down to the second hotel, that all indications are that the meeting at the hotel was not the be-all and end-all of the conspiracy that had formed long before that. And as with other Brady analyses, usually you're faced with the position of what would have happened had this been disclosed. Well, this case is its own control case, and I can't imagine how more damaging the information could have come out for the government, that after it came out, then they reopened, it was emphasized. We now know that there was no prejudice because the jury heard the evidence. They were able to throw that into the mix of their evaluation of this, and that the result would not have been different because of the overwhelming evidence. With regard, are there any other questions in connection with that? I suppose that argument you've just given also goes to the standing issue of intuitive and the outrageous. That would be correct, and with regard to the outrageous government misconduct, you ought to take note that on the Tuesday that the defendant said, I'm going to be robbing this bank, he was then negotiating a $1 million marijuana deal with Jamaicans. No bank robbery occurred, but from all indications that that bank robbery was going to happen and that the agents were successful in diverting that. The misconduct is when the government causes the harms that it is charged with preventing, and in this case, the government was faced with a harm that the defendant was saying that he was going to cause, and the government, the agents, the ATF, prevented that harm. With regard to that, is there any other questions by this panel? Essentially, giving a drug dealing robber the opportunity to rob a drug dealer is not misconduct. Any other questions? A couple of quick points. Judge Kleinfeld, as you had said, I'm reading right from the model instruction right now, and that instruction says you should not change an honest belief as to the weight or effect of the evidence that Mr. Miller is somehow relying upon is in the Allen charge. Mr. Miller is saying that supposedly the charge that the judge gave the jury was stick-by-your-guns. We can read what district court instructed the jury over and over again. There is no stick-by-your-guns language in there. She says, I want all of you to discuss the case with your fellow jurors to reach an agreement if you can do so. So, again, it's the district judge personalizing it. I want you to reach an agreement if you can do so. Do not be afraid to change your opinion. It is important that you attempt to reach a unanimous verdict. I want all of you to listen to the views of your fellow jurors. Again, I want, the district judge, the federal district judge is telling this juror, I want all of you to listen to the views of your fellow jurors. I mean, the coercion in this case is clear. This case needs to be sent back for a new trial. And, of course, then we'll have the tape. These defendants will be allowed to present their best defense at a new trial. I bet you'll do a new request, making sure you get all tapes. I was not the trial lawyer, but we'll make sure that we have every single tape. If we were to reverse on Seichua, does that mean we don't reach any other issue in the case? I think the only issue you do have to address is the sufficiency of the evidence. Do we have to reach the outrageous government contract question? I don't think you have to. And, frankly, I think it may be better for that to be brought back down and re-litigated on a fresh record, and with some of this new material that's coming out. I don't think you have to reach that issue. The only ones would be the sufficiency of the evidence, because that would bar retrial on some of the counts. Thank you. Thank you, counsel. And just briefly, Your Honor, we dispute that there was any transcript of the offending portion of Tape 9A ever provided. When that tape was played, about five minutes before what would have been the end of the rebuttal argument, everyone jumped up and said, this is something we've never heard, went sidebar, and it was all new to all counsel. Interesting. Apparently, no matter how many times the district judge listened to it, you couldn't really tell what it meant. Well, I think what was being said. At some of the subsequent post-trial motions, it seemed to get a bit muddled. But I think it's clear in the transcript that, I know I had asked Agent Pagnotti and Cross if Mr. Steele was one of the two that did not, and he said he was one of the ones that nodded. He made it clear he was one of the two. But then later, at actually 1512 of Volume 10, he says that he was one of the two that didn't nod. And he made it clear that it was the didn't nod. So I don't think there's any dispute in the record as to what that tape tells us. And also, I do want to, as I mentioned earlier, the 801D2 issue under Bibro, that would be a straight reversal, at least as to the two co-defendants. So that would be an issue, I think, even if the court rules in our favor on the other issue. I think it would be a straight reversal as to Mr. Steele, Mr. Brown on 801D2E. And finally, I would again remind the Court that the Court did make the finding that the crux of the case was whether an agreement was reached on November 14th. And of course, the government talks about the items that were brought, but the agent made that a precondition of the meeting, that they better be tools and they better be more than baseball bats. With that, we'll submit, Your Honor. Thank you.
judges: Canby, Kleinfeld, Bybee